**In re Lisa Jane BROWN, Debtor.**

**Bankruptcy No. 2–92–03332.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

July 27, 1994.

Lloyd D. Cohen, Columbus, OH, for debtor.

Frank M. Pees, Chapter 13 Trustee, Worthington, OH.

Samuel L. Calig, Calig & Handelman, Columbus, OH.

John F. Cannizzaro, Marysville, OH.

Joseph F. Castner, Castner & Kenney, Newark, OH.

Christopher M. Cooper, Columbus, OH.

Ric Daniell, Columbus, OH.

G. Timothy Dearfield, Westerville, OH.

Robert H. Farber, Jr., Columbus, OH.

Mark M. Flanagan, Westerville, OH.

Christopher Gallutia, Columbus, OH.

Bruce L. Greenberger, Zanesville, OH.

Brian L. Herzberger, Columbus, OH.

Ruth Ann Hohl, Columbus, OH.

Robert M. Hoskinson, Columbus, OH.

Nicholas W. Jones, Delaware, OH.

David C. Lasky, Columbus, OH.

Pamela N. Maggied, Columbus, OH.

J. William Merry, Zanesville, OH.

Mark V. Minister, Columbus, OH.

Lee C. Mittman, Columbus, OH.

Robert J. Morje, Columbus, OH.

Judith M. McInturff, Columbus, OH.

James E. Nobile, Columbus, OH.

Garry Sabol, Columbus, OH.

Stephen E. Schafer, Columbus, OH.

William A. Semons, Columbus, OH.

Mark W. Sotak, Westerville, OH.

Robin S. Stith, Columbus, OH.

Gregory A. Wooldridge, Columbus, OH.

### MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

On April 21, 1992, the Court conducted a hearing on the Motion to Approve Sale and Motion to Allow Consumer Debt filed by Lisa Jane Brown ("Debtor"). The standing chapter 13 Trustee ("Trustee") participated in the hearing. Based upon the evidence presented and arguments in support of the Motion presented by Debtor's counsel and the Trustee, the Court entered an Order as requested by the Debtor on April 26, 1994. The Court indicated, however, that given the overall

importance of the issues presented, this Memorandum Opinion and Order would be prepared.[1]

On March 28, 1992, the Debtor filed a petition for relief under chapter 13 of the United States Bankruptcy Code. In the schedules the Debtor disclosed: assets in the amount of $1,629.00, debts in the amount of $4,947.83, net monthly income in the amount of $1,055.71, and total monthly expenses in the amount of $885.71. At the time of filing, the Debtor was employed as a new accounts representative at Fifth Third Bank.

On April 28, 1992, the Debtor filed a plan that committed excess monthly income of $170.00 to pay all creditors one hundred percent (100%). On June 3, 1992, the Debtor and BancOhio (now known as National City Bank) entered into a stipulation for an interest rate of 15.20% to be paid on its secured claim relating to two motor vehicles. On July 9, 1992, the one hundred percent (100%) plan was confirmed, and a wage deduction order was entered. A review of the file indicates that there have been no defaults; i.e., no motions to dismiss or motions to lift stay have been filed.

On March 29, 1994, the Debtor filed the instant Motion. In this Motion the Debtor indicated that her current vehicle was nine years old, and that it required maintenance expenditures in excess of $150.00 per month. The Debtor requested permission to sell this vehicle for six hundred dollars ($600.00) and give the proceeds to the Trustee for plan payments, as the lien had been paid in full under the plan. The Debtor further disclosed that arrangements had been made with Dave Gill Pontiac for that dealer to obtain financing for as much as $10,000.00 with $1,500.00 down. The maximum interest rate would be 23%, and the payments would not exceed $330.00 per month for 48 months.

Upon confirmation of a chapter 13 plan, property of the estate vests in the debtor, and all after-acquired property, including earnings, becomes property of the estate. 11 U.S.C. §§ 1306 and 1327. As postpetition earnings are the backbone of funding for the confirmed plan, subsequent credit transactions are subject to scrutiny by the Trustee and the Court. *See* 11 U.S.C. § 1305(c) and L.B.R. C–3.18.15. Postpetition consumer creditors may lose their ability to receive payment if they "... knew or should have known that prior approval by the trustee of the debtor's incurring the obligation was practicable and was not obtained." 11 U.S.C. § 1305(c). Further, the Local Rules of this Court provide:

> Any post-petition extensions of credit sought by the debtor which aggregate in excess of five hundred dollars ($500.00), shall be in the form of a motion subject to Fed.R.Bankr.P. 4001(c) and (d) and LBR 6.1. Such motions shall be served upon the trustee and all parties in interest unless the plan is a one hundred percent (100%) plan in which instances service may be only upon the trustee and upon any party retaining or being granted a lien against property in connection with such extension of credit.

LBR C–3.18.15.

During the course of the hearing, the Debtor, Debtor's counsel, and the Trustee provided the Court with more current information regarding the transaction. Further, the parties discussed the problems generally experienced by chapter 13 debtors in trying to obtain credit during the three-to-five-year period between confirmation and consummation of their plans.

The Debtor informed the Court that the arrangement actually called for an interest rate of 25% to be financed by Saturn Financial. The Debtor also stated that the proposed transaction included an extended warranty that would cost $800.00, to be financed at the rate of 19.8%. The Debtor stated that the automobile under consideration was a 1992 Storm with approximately fifteen thousand miles, and it is under a three-year or 36,000–mile warranty.

The Debtor, Debtor's counsel and the Trustee indicated that based upon their efforts in this case and experience in general, that there are currently three or four major automobile dealers in the area that are willing to sell to and procure financing for chap-

---

**1.** This Opinion addresses only that portion of the Motion relating to obtaining postpetition credit.

ter 13 debtors.[2] Apparently, chapter 13 debtors have at least in the past been considered greater credit risks than their chapter 7 counterparts who are ineligible for at least six years to file another bankruptcy case and who, because they have received a discharge of other obligations, are perceived as having a greater ability to make car payments.

The Court learned that typically chapter 13 debtors are informed by car dealers that they must first obtain court approval before any transaction is finalized, and that automobiles cannot be held for any length in order to obtain court approval. These circumstances have led to or dictated the practice that this Court enters "blanket" approval orders that specifies some dollar limit parameters of the cost of the vehicle, and it is then incumbent upon debtors to obtain the best possible automobile and financing terms that the market forces dictate. Also, as explained to the Court, debtors typically seek to purchase another vehicle because their current transportation is unreliable, and reliable transportation is essential to their ability to fund plan payments. Accordingly, prior approval of all of the details of a given transaction would entail a substantial increase in the number of such motions that would be heard by the Court on an emergency basis.

At the conclusion of the hearing, the Court entered an Order Granting Debtor's Motion to Approve Sale and Motion to Allow Consumer Debt as requested by the Debtor. The only modification was that the transaction consummated could not include extended warranty coverage.[3] Also, the Court requested that the Trustee and Debtor's counsel make an effort to procure financing at a rate below the maximum of 25% specified to the Court. Subsequently, the Court learned that the Debtor completed the transaction, but was unable to negotiate a lower rate. Apparently, it is the goal of the Debtor to refinance the purchase through her current employer at approximately twelve percent

(12%) in a year from now when her plan payments will be complete.

The Court understands the needs of creditors to make risk assessments and make such determinations part of their charges for extending credit. The Court also understands the needs of chapter 13 debtors to obtain credit to purchase or replace items essential to plan consummation, such as automobiles. What is not understandable, however, is the assessment of charges, that while within the legal limits established by state law, bear no reasonable relationship to the risk of loss in a case such as this. Despite whatever actuarial records that are available and in disregard of any preconceived notions of the creditworthiness of a chapter 13 debtor, cases should be viewed on an individual basis. Here, the Debtor had total debt of less than six thousand dollars. She has been in a one hundred percent plan for the last two years and has not been in default. Indeed, during the course of the plan, she has liquidated the lien on her old automobile.

Under circumstances such as this, the exercise of the right of the creditor to ensure itself against risk of loss through financing charges becomes punitive and takes advantage of debtors who have the Hobson's choice of buying the vehicle as offered or continuing to drive their current vehicle, or if not operable, seeking alternative means of transportation. Also, such actions place the Court in the untenable position of approving a transaction that is too expensive, in effect giving the Court's imprimatur to a purchasing decision that may be as lacking in judgment as the debtor's prepetition financial arrangements, or disapproving the arrangement and possibly destroying or reducing the debtor's ability to work and fund the confirmed plan.

If chapter 13 debtors are to be rehabilitated, they must be educated and encouraged to enter into transactions that are in both their long-term and short-term best interests. The current transaction would have the Debtor purchase a vehicle at a rate of inter-

---

**2.** The parties indicate that these dealers include Dave Gill Pontiac, Bob McDorman Chevrolet, and Trader Bud's Westside Dodge.

**3.** The Court concluded that the purchase of an extended warranty for an automobile already

subject to a manufacturer's warranty did not make economic sense given the cost and the fact that the coverage itself was subject to a 19.8% finance charge.

est so high that the balance due and ultimately payable in all likelihood dramatically exceeds the value of the vehicle.[4] Where this happens, debtors will pay long term for the difference between the principal and interest balance and the value of the automobile. If they try to trade the vehicle, they will have to finance the "negative equity," or if they try to sell the automobile it will be difficult to obtain a price that covers the amount paid for the car. In this manner, the initial bad judgment becomes self-perpetuating, and has a continuing adverse impact upon debtors.

While the Court believes that market forces should be allowed to prevail within the legal limits established under the usury laws of the state of Ohio, debtors should be viewed individually; i.e., percentage to be paid to creditors under the plan, length of time in a confirmed plan, and the post-confirmation payment history. This will require that debtors' counsel do more than prepare and file the papers requesting leave to enter into postpetition credit transactions. They must scrutinize the terms of the arrangement and educate and assist the debtors in finding the best possible transactions. It will also require the continuing efforts of the Trustee to persuade and educate the credit community in terms of their lending policies and practices.

█ It is the view of this Court that the Trustee is far more than a mere disbursing agent and has the statutory authority and ability to assist eligible debtors in their credit transactions that occur between confirmation and consummation of the plan. Standing chapter 13 Trustees should be encouraged by the U.S. Trustee Program to make reasonable efforts to provide credit rehabilitation services to chapter 13 debtors both pre- and post-consummation. It is only through such efforts that cycles of poor financial judgment can be broken and debtors can be returned to the market and credit community with a greater likelihood of success.[5]

█ In future cases before this Court, prior to filing postpetition credit motions, debtors' counsel must know all of the terms and actively participate in aiding the debtor in obtaining the best arrangement possible. Applications should detail and include:

1. automobile dealers contacted and results of these contacts;

2. the vehicle under consideration, its cost, mileage, and existence and nature of any factory warranty;

3. the financing terms, including name of the financing entity, annual percentage rate, monthly payment and number of payments;

4. where the interest rate is built into the price of the automobile, the sum attributable to finance charges must be disclosed;

5. the existence and cost, including financing charges, for any extended warranties; and

6. a copy of a current budget should be attached.

It is hoped that debtors' counsel will actively seek the assistance of the Trustee in locating alternative financing resources at reasonable rates.

█ Further, in the future, where the plan proposes a significant dividend of between seventy and one hundred percent, and there has been a favorable payment history for a significant period (one or two years), this Court will not approve financing arrangements with excessive interest rates.[6] If

---

4. The Court has recently observed a range of rates from 7.5% to 25% charged in chapter 13 cases.

5. It is in the long-term best interests of debtors and creditors to have rehabilitated debtors return as well-informed consumers unlikely to repeat past mistakes. The extraction of excessive interest rates simply because they are allowed by state law and without regard to the qualities of individual debtors, is contrary to these interests.

6. The Court has purposely declined to define in numerical form what is excessive. This approach is taken because of the wide range of rates observed, debtors will propose a wide variety of different plan percentages and will have different payment histories, etc., and the fact that rates over time will naturally fluctuate. What is excessive this year may be reasonable in years to come. Also, the main goal is to encourage all parties, debtors, the standing trustee, automobile dealers and lenders, to tailor interest charges to

there are peculiar circumstances that may warrant higher charges, they must be expressed to the Court. The Court understands that with this change there is the possibility that some deserving debtors may not be able to obtain financing. On the other hand, to continue on the current course only perpetuates the unreasonable use of interest rates to address risk factors rather than judging each debtor on his or her own merit and deciding an appropriate level of risk protection. This Court wishes to break the current cycle and will certainly not enter any further orders that perpetuate the status quo.

**IT IS SO ORDERED.**

the quality of debtors' plans and their post-con-        firmation performance.